IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No.

STATE OF COLORADO, by and through its Department of Natural
Resources,

      Plaintiff,

v.

UNITED STATES BUREAU OF LAND MANAGEMENT, an agency of
the U.S. Department of the Interior;
DAVID BERNHARDT, in his official capacity as Secretary of the
Department of the Interior;
WILLIAM PENDLEY, in his official capacity as Deputy Director for
Programs and Policy for the Bureau of Land Management; and
JUNE SHOEMAKER, in her official capacity as the Deputy State
Director for the State of Idaho for the Bureau of Land Management,

      Defendants.

---

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND PETITION FOR REVIEW OF AGENCY ACTION

---

### INTRODUCTION

1.     In this Complaint and Petition for Review, the State of

Colorado (the "State"), by and through its Department of Natural

Resources ("DNR") asks the Court to set aside the Approved Resource

Management Plan for the Bureau of Land Management's ("BLM")

Uncompahgre Field Office (the "Approved UFO RMP").

2.     The Approved UFO RMP fails to adequately conserve and

protect the State's wildlife and natural resources, and it conflicts with

State plans, policies, and programs.

3.     DNR identified these problems in its protest of the

proposed UFO RMP and Final Environmental Impact Statement ("the

Proposed UFO RMP") and Governor Jared Polis filed a review pointing

out inconsistencies between the Proposed UFO RMP and the State's

policies, plans, and programs.

4.     BLM, through its Acting Director William Pendley, denied

DNR's protest, but Acting Director William Pendley's effort to resolve

DNR's protest has no legal effect because his service as the BLM's

Acting Director violated the Appointments Clause of the United States

Constitution and the Federal Vacancies Reform Act.

5.     Because the BLM has not properly resolved DNR's protest

of the Proposed UFO RMP, this Court should set aside the Approved

2

UFO RMP.

## JURISDICTION AND VENUE

6.     Because this action arises under the United States

Constitution, the Federal Vacancies Reform Act, 5 U.S.C. § 3345 *et*

*seq.*, and the Federal Land Policy and Management Act, 43 U.S.C. §

1701 *et seq.*, this Court has federal question jurisdiction under 28

U.S.C. § 1331.

7.     DNR has standing to pursue this claim, because the

injury to DNR, BLM's adoption of the Approved UFO RMP without

properly resolving DNR's protest of the Proposed UFO RMP, will

cause concrete harm to DNR's interest in protecting and conserving

the State's wildlife and natural resources and this harm will be

redressed if the Court vacates the Approved UFO RMP.

8.     This claim is ripe for judicial review, because the BLM

took final agency action on April 10, 2020, when it provided public

notice of the Approved UFO RMP in the *Federal Register*.  Notice of

Availability of the Record of Decision for the Uncompahgre Field Office

3

Approved Resource Management Plan, Colorado, 85 Fed. Reg. 20296 (April 10, 2020).

9.      DNR has exhausted all required administrative remedies.

10.      Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) and (e)(1).  Defendants are United States agencies or officers sued in their official capacities.  Plaintiff DNR is an executive agency of the State of Colorado, which is a sovereign state in the United States of America.  A substantial part of the events or omissions giving rise to the claims presented in the Complaint and Petition for Review occurred in this judicial district.

## PARTIES

11.      Plaintiff DNR is an executive agency of the State of Colorado, which is a sovereign state in the United States of America.

12.      Defendant BLM is an agency of the United States under the Administrative Procedure Act ("APA"), 5 U.S.C. § 500 *et seq.*

4

BLM manages the use and maintenance of 245 million acres of federal public lands (around 12 percent of the nation's landmass) and 700 million acres of subsurface acreage (around 30 percent of the nation's minerals), including approximately 675,800 acres of public lands and 971,220 acres of federal mineral estate across Montrose, Gunnison, Ouray, Mesa, Delta, and San Miguel Counties in southwestern Colorado, which are managed by the BLM's Uncompahgre Field Office.

13.     Defendant David Bernhardt is the Secretary of the Department of the Interior. He is sued in his official capacity.

14.     Defendant William Pendley is the BLM's Deputy Director for Programs and Policy.  He purported to exercise the authority of the BLM Director at the time the actions challenged in this Complaint and Petition for Review were taken.  He is sued in his official capacity.

15.     Defendant June Shoemaker is the BLM's Deputy State Director for the State of Idaho.  She purported to exercise the authority of the BLM's Assistant Director of Resources and Planning

at the time the actions challenged in this Complaint and Petition for Review were taken.  She is sued in her official capacity.

## CONSTITUTIONAL AND STATUTORY BACKGROUND

### *The Appointments Clause*

16.     Article II of the United States Constitution requires the President to obtain the "Advice and Consent of the Senate" before appointing "Officers of the United States." U.S. Const. art. II, § 2, cl. 2.

17.     The Framers split responsibility for offices requiring Presidential appointment and Senate confirmation between the Executive and Legislative Branches to put a "check upon a spirit of favoritism in the President," "prevent the appointment of unfit characters," and provide a "source of stability in the administration." The Federalist No. 76 (A. Hamilton).

18.     "Any appointee exercising significant authority pursuant to the laws of the United States is an 'Officer of the United States,' and must, therefore, be appointed in the manner prescribed by" the Appointments Clause.  *Freytag v. C.I.R.*, 501 U.S. 868, 881 (1991)

(internal quotation marks omitted); *see also Lucia v. S.E.C.*, 138 S. Ct. 2044, 2051 (2018).

### *The Federal Vacancies Reform Act*

19.    The Federal Vacancies Reform Act (the "Vacancies Act"), 5 U.S.C. § 3345 *et seq.*, prescribes the "exclusive means for temporarily authorizing an acting official to perform the functions and duties" of a vacant office requiring Presidential appointment and Senate confirmation under the Appointments Clause. 5 U.S.C. § 3347.

20.    The Vacancies Act allows only three classes of individuals to assume, on an acting basis in the event of a vacancy, the functions and duties of an office requiring Presidential appointment and Senate confirmation under the Appointments Clause:  (1) the "first assistant" to the vacant office, *id.* § 3345(a)(1); (2) a person serving in an office for which Senate confirmation was required, if directed by the President to do so, *id.* § 3345(a)(2); or (3) a senior-level employee of the agency in which the vacancy occurs, if directed by the President to do so, provided they served in a position within the agency for at least 90

days in the year preceding the vacancy, *id*. § 3345(a)(3).

21.    A person otherwise qualified under § 3345(a) is disqualified if they are nominated by the President for appointment to the subject office and they either (1) did not serve in the position of "first assistant" to the vacant office during the year preceding the vacancy, or (2) served in the position of "first assistant" to the vacant office for less than 90 days in the year preceding the vacancy. *Id*. § 3345(b)(1).

22.    Even if a person is qualified under the Vacancies Act to perform in an acting capacity the functions and duties of an office requiring Presidential appointment and Senate confirmation, they may not do so indefinitely.  The Vacancies Act limits the time period during which an office requiring Presidential appointment and Senate confirmation may be filled on a temporary basis to 210 days from the date when the vacancy occurred.  *Id*. § 3346.  The 210-day time period is extended by 90 days during the transition between Presidential administrations, *id*. § 3349a, and it can be re-set if the President

submits a nomination for the position to the Senate, provided that the then-Acting Director is qualified under § 3345(a) and not disqualified under § 3345(b)(1), *id.* § 3346(a)(2).

23.    If either of these limitations is violated and an individual unlawfully performs the functions and duties of an office requiring Presidential appointment and Senate confirmation under the Appointments Clause, the actions taken by them in the performance of those functions and duties "shall have no force or effect." *Id.* 3348(d)(1).  Moreover, any such actions may not be ratified afterwards. *Id.* § 3348(d)(2).

*The BLM and the Federal Land Policy and Management Act*

24.    The Federal Land Policy and Management Act ("FLPMA") charges BLM with administering the lands and subsurface acres within its purview "in a manner that will protect the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archeological values." 43 U.S.C. § 1701(a)(8).

9

25. FLPMA instructs BLM to accomplish this directive by developing, maintaining, and revising Resource Management Plans ("RMPs") for particular areas of public land. *Id.* § 1712(a)-(b); *see also* 43 C.F.R. § 1601.0–5(n). RMPs "guide and control future management actions" by designating "[l]and areas for limited, restricted or exclusive use" and determine "[a]llowable resource uses (either singly or in combination) and related levels of production or use to be maintained." 43 C.F.R. §§ 1601.0–2, 1601.0–5(n)(1)-(2).

26. Both FLPMA and the RMP regulatory guidelines provide significant procedural opportunities for state and local input on public land management planning processes and decisions.

27. FLPMA requires "meaningful public involvement" in the management process. *See* 43 U.S.C. § 1712(c)(9).

28. BLM regulations provide an opportunity for a state to file recommendations on draft RMPs to ensure that any federal management plans comport with state policies, plans, and programs. 43 C.F.R. §§ 1610.3–1(c); 1610.3–2(e). The regulations further require

BLM State Directors to ensure consistency to the maximum extent practicable with a state's resource related plans, policies, or programs. *Id.* § 1610.3-1(d)(1).

29.     Prior to the approval of a proposed RMP, the BLM State Director submits the plan to the governor, who has 60 days to identify any inconsistencies between the proposed RMP and state plans, policies, or programs, and to recommend changes to the proposed plan to resolve the inconsistencies.  *Id.* § 1610.3–2(e).  If the BLM State Director rejects the governor's recommendations, the governor has 30 days to submit a written appeal to the BLM Director.  *Id.*

30.     BLM regulations also provide a protest procedure for draft RMPs.  Any person who participated in the planning process, including state agencies, may submit a written protest of a draft RMP directly to the BLM Director.  *See id.* § 1610.5–2(a).  The BLM Director "shall promptly render a decision on the protest."  *Id.* § 1610.5–2(a)(3).  "The decision shall be in writing and shall set forth the reasons for the decision."  *Id.*  The "decision of the Director shall be the final decision

11

of the Department of the Interior." *Id.* § 1610.5–2(b).  The Director's

protest ruling finalizes the RMP (or RMP amendment).

31.     BLM policy purportedly permits delegation of the BLM

Director's responsibility for resolving RMP protests, but it requires any

such delegation, which "has a direct impact on some sector of the

public," to be "published in the Federal Register."  BLM Manual

Section 1203, 2.3 (Oct. 27, 2016); *see also* Department of the

Interior, Departmental Manual Part 200 DM 1.10 (Aug. 22, 2001).

### *Colorado's Interest in the UFO RMP*

32.     All wildlife in Colorado not held in private ownership is

the property of the State, which also has primary jurisdiction and

authority to manage fish and wildlife throughout Colorado.  Colo.

Rev. Stat. §§ 33-1-101(2); 33-1-104(1).

33.     On behalf of the State, DNR develops, preserves, and

enhances the State's natural resources for the benefit and

enjoyment of current and future citizens and visitors.  DNR is also

responsible for developing and implementing programs to conserve

12

species native to the State that have been identified as threatened
or endangered under state or federal law.  *Id*. § 24-33-111.

34.     In addition, big game hunting, fishing, wildlife watching,
and other forms of outdoor recreation, which attract both residents and
non-residents, play a critical role in the State's economy, in particular
providing essential income for rural communities, like the counties
included within the Uncompahgre Field Office planning area.

35.     The total economic contribution of outdoor recreation to
the State is over $34.5 billion dollars annually, including over $41
million from over 186,000 big game hunter user days in the counties
within the Uncompahgre Field Office planning area.

36.     This is a sustainable source of economic contribution only
if the lands can support big game populations and quality hunting
opportunities, quality wildlife viewing opportunities, and appropriate
recreation opportunities.

37.     These interests will be adversely affected by the Approved
UFO RMP, particularly with respect to two specific issues raised in

DNR's protest and the State's consistency review: protection of big game migration corridors and winter range; and conservation and recovery of the federally listed Gunnison sage-grouse.

FACTUAL ALLEGATIONS

*BLM's Acting Directors*

38.　Congress established the office of Director to lead BLM. By statute, the position of Director of the BLM must be filled "by the President, by and with the advice and consent of the Senate." 43 U.S.C. § 1731(a).

39.　BLM has operated without a Senate-confirmed Director since Neil Kornze left the position on January 19, 2017. That day, the outgoing Secretary of the Interior, Sally Jewell, issued a Secretarial Order to delegate temporarily the "functions, duties, and responsibilities" of the BLM Director to Kristin Bail, the Assistant Director for the Office of National Conservation Lands and Community Partnerships. Secretary Sally Jewell, Order No. 3345 (Jan. 19, 2017).

40.　On March 15, 2017, Secretary of the Interior Ryan Zinke

14

issued Amendment 2 to Order No. 3345, delegating the "functions, duties, and responsibilities" of the BLM Director to Michael Nedd, the Assistant Director of Mineral and Realty Management.

41.     On November 14, 2017, Secretary Zinke issued Amendment 12 to Order No. 3345, delegating the "functions, duties, and responsibilities" of the BLM Director to Brian Steed, who began working at BLM in October of 2017 as the Deputy Director of Policy and Programs.

42.     On May 11, 2019, Secretary of the Interior David Bernhardt issued Amendment 26 to Order No. 3345, delegating the "functions, duties, and responsibilities" of the BLM Director to Casey Hammond, who was the Department of Interior's Principal Deputy Assistant Secretary for Land and Minerals Management.

43.     On July 29, 2019, Secretary Bernhardt issued Amendment 28 to Order No. 3345, delegating the "functions, duties, and responsibilities" of the BLM Director to William Pendley, who began working at BLM in July of 2019 as the Deputy Director for Policy and

15

Programs.

44.     Secretary Bernhardt amended Order No. 3345 four times to extend William Pendley's tenure.

45.     Following the fourth and final extension, Pendley issued a memorandum purporting to designate himself as the "first assistant" for purposes of the Vacancies Act.

46.     On June 30, 2020, the President formally nominated William Pendley to become the BLM Director.

47.     On September 8, 2020, the President withdrew William Pendley's nomination.

48.     Although Pendley and BLM have avoided using the title of "Acting Director," Pendley in fact served as the Director of the BLM in an acting capacity within the meaning of the Vacancies Act and for purposes of the Appointments Clause of the United States Constitution.

49.     The BLM held Pendley out to the public as "Exercising Authority of the Director" in official communications and on the

16

BLM's website. *See* "Leadership," Bureau of Land Management,

https://perma.cc/8KUR-3VGN (captured July 20, 2020) (listing

"William Perry Pendley" as "Exercising Authority of the Director");

"Organizational Chart," Bureau of Land Management,

https://perma.cc/B8QV-LJ45 (captured July 20, 2020) (same);

"William Perry Pendley," Bureau of Land Management,

https://perma.cc/TR68-ZZDY (captured July 20, 2020) (same).

50. Pendley also identified himself as an acting agency

head. In an editorial in the *Billings Gazette*, for example, Pendley

defended his record and his leadership and argued that "Senate

confirmation is not required for acting heads of agencies." William

Perry Pendley, *Guest opinion: BLM serves public interest in multiple*

*use*, Billings Gazette (Feb. 6, 2020), https://perma.cc/G9BH-QPXD

(captured July 20, 2020). Pendley was regularly understood by

members of the public and the news media to be leading the BLM.

*See, e.g.*, Kirk Siegler, *BLM Acting Director Defends Agency's*

*Controversial Move to Colorado*, NPR (Feb. 18, 2020),

17

https://perma.cc/TW32-64AS (captured July 20, 2020).

51.     William Pendley continued to exercise the functions, duties and responsibilities of the BLM Director until September 25, 2020, when Judge Brian Morris, the Chief Judge for the United States District Court for the District of Montana, enjoined William Pendley from exercising the authority of the BLM Director based on his conclusion that Pendley's service as the Acting Director of the BLM violated the Vacancies Act and the Appointments Clause.  *See Bullock v. U.S. Bureau of Land Mgmt.*, No. 4:20-cv-00062-BMM, 2020 WL 5746836 (D. Mont. Sept. 25, 2020).

*The Uncompahgre Field Office Resource Management Plan*

52.     BLM began developing the UFO RMP, which revises the prior Uncompahgre Basin RMP and portions of the San Juan/San Miguel Planning Area RMP, in 2010.

53.     On behalf of the State, DNR participated as a cooperating agency in the UFO RMP process.

54.     DNR's cooperation in the UFO RMP process was limited to

18

reviewing and commenting on draft text rather than being utilized as an agency with special expertise, despite the fact that DNR, through its Division of Parks and Wildlife, volunteered to assist with writing and reviewing sections of the UFO RMP where particular expertise in wildlife, wildlife habitat, and wildlife management was needed and in areas where other resources may have impacts on wildlife.

55.     The BLM did not respond to DNR's comments during the cooperating agency process, and DNR was not provided a final administrative copy of the draft of the UFO RMP and of the accompanying Environmental Impact Statement ("Draft UFO RMP") before that document was finalized and provided to the public.

56.     Although a number of the concerns raised by DNR during the cooperating agency process were recorded by BLM as "Action Items" to address within the Draft UFO RMP, those concerns were not addressed in the Draft UFO RMP.

57.     On June 3, 2016, BLM published the Draft UFO RMP.

58.     On November 1, 2016, two of DNR's divisions, the Division

of Parks and Wildlife and the Colorado Water Conservation Board,

submitted comments on the Draft UFO RMP.  In those comments,

DNR's divisions raised concerns regarding, among other issues, the

absence of desired conditions and standards for big game ungulates

and an inadequate analysis of the conservation of habitat for the

Gunnison sage-grouse, which is listed as a threatened species under

the Endangered Species Act.  Endangered and Threatened Wildlife and

Plants:  Threatened Status for Gunnison Sage-Grouse, 79 Fed. Reg.

69192 (Nov. 20, 2014).

59.    On June 28, 2019, the BLM published the Proposed UFO

RMP and notified the public that all protests to the Proposed UFO

RMP were to be "in writing and filed with the BLM Director."  Notice

of Availability of the Proposed Resource Management Plan and Final

Environmental Impact Statement for the Uncompahgre Field Office,

Colorado, 84 Fed. Reg. 31089 (June 28, 2019).

60.    On July 29, 2019, the State, acting by and through DNR

and the Division of Parks and Wildlife submitted a protest of the

Proposed UFO RMP to the BLM Director.  In its protest, the State

objected to the lack of protection for winter range and migration

corridors necessary for the Division of Parks and Wildlife to sustain big

game population objectives and inadequate protection for Gunnison

sage-grouse and sage-grouse habitat.

61.  On September 9, 2019, the State, through its Governor,

Jared Polis, submitted its consistency review to the BLM.  Governor

Polis identified a number of inconsistencies between the Proposed UFO

RMP and State laws, plans, programs, and policies, including

inconsistencies between the Proposed UFO RMP and (1) Executive

Order D-2019-011, Conserving Colorado's Big Game Winter Range and

Migration Corridors; (2) Colorado's Action Plan for Implementing

Secretarial Order 3362; (3) the Gunnison Sage-grouse Rangewide

Conservation Plan; and (4) Colorado House Bill 19-1261 and Senate

Bill 19-181.

62.  The BLM Colorado State Director rejected Governor Polis'

recommendations, but after receiving assurances from the BLM that

the majority of the State's wildlife-related concerns would be addressed in a separate, statewide RMP amendment, the Governor elected not to appeal the BLM State Director's rejection of his recommendations to the BLM Director.

63.     BLM issued a Director's Protest Resolution Report on February 7, 2020.

64.     The BLM Director denied DNR's protest, concluding that the BLM Colorado State Director followed the applicable laws, regulations, and policies, and considered all relevant resource information and public input.  Uncompahgre Field Office Record of Decision and Approved Resource Management Plan at I-14; *see also* Notice of Availability of the Record of Decision for the Uncompahgre Field Office Approved Resource Management Plan, Colorado, 85 Fed. Reg. 20296 (April 10, 2020) (noting that "The BLM received 13 protest letters from parties with standing during the ensuring protest period, and the BLM Director resolved those protests").

65.     In spite of BLM's direction to the public that all protests of

the Proposed UFO RMP were to be "in writing and filed with the BLM

Director" and its notice that "the BLM Director resolved those

protests," on information and belief June Shoemaker, purporting to

exercise the authority of the BLM's Acting Assistant Director for

Resources and Planning, signed a letter sent to DNR indicating that

she had resolved DNR's protest. And on January 8, 2021, BLM issued

an errata sheet indicating that its Acting Assistant Director for

Resources and Planning resolved the protests to the Proposed UFO

RMP.

66.     BLM never published notice in the *Federal Register* that

anyone other than the BLM Director would be resolving or had in fact

resolved protests to the Proposed UFO RMP.

67.     On April 10, 2020, the BLM issued the Record of Decision,

finalizing and approving the Approved UFO RMP.

68.     The Approved UFO RMP addressed some concerns raised

in the State's consistency review, but it failed to adopt adequate

protections for wildlife populations and habitat consistent with

23

existing DNR plans and recommendations, including those required by Executive Order D-2019-011, Colorado's Action Plan for Implementing Secretarial Order 3362, DNR Division of Parks and Wildlife big game Herd Management Plan population objectives, and the Gunnison Sage-grouse Rangewide Conservation Plan. The Approved UFO RMP also failed to address the greenhouse gas reduction targets required by HB 19-1261 and the emission minimization and public participation requirements of SB 19-181.

69.     BLM's decisions, which fail to prioritize the protection of wildlife habitat and fail to acknowledge and accommodate the State's greenhouse gas reduction targets and emission minimization and public participation requirements, are inconsistent with the agency's federal law obligations. Further, they erode longstanding management protections and fail to take into consideration concerns expressed by primary stakeholders, particularly DNR and the State.

## CLAIMS FOR RELIEF

*First Claim for Relief:  Violation of the Federal Vacancies Reform Act*
*and the Appointments Clause*

70.　DNR repeats and incorporates by reference the allegations in all paragraphs of this Complaint and Petition for Review.

71.　The Director of the BLM, a position requiring Presidential nomination and Senate confirmation, 43 U.S.C. § 1731(a), "must . . . be appointed in the manner prescribed by" the Appointments Clause. *Freytag v. C.I.R.*, 501 U.S. 868, 881 (1991) (internal quotation marks omitted).

72.　Accordingly, the appointment of acting officers to discharge the duties of the BLM Director is governed by the Vacancies Act. 5 U.S.C. § 3345(a).

73.　Secretary Bernhardt's appointment of William Pendley as Acting Director of the BLM, William Pendley's exercise of the authority of the BLM Director, and William Pendley's actions taken in that role violate several provisions of the Vacancies Act and, by extension, the Appointments Clause.

25

74.     Pendley was not qualified to serve as the Acting Director of the BLM, because he was not the "first assistant" to the Director of the BLM, he did not serve in an office for which Senate confirmation was required, and he was not a senior-level employee at the BLM when the vacancy in the office of the BLM Director occurred in January of 2017. *See* 5 U.S.C. § 3345(a).

75.     Moreover, Pendley's service as the Acting Director violated the time limits imposed by the Vacancies Act.  The initial 300-day window for the fulfillment of the duties of the BLM Director in an acting capacity ended on November 15, 2017, and it was not re-set until the President nominated William Pendley to serve as the BLM Director.   *See id*. §§ 3346(a), 3349a.

76.     Finally, the President's nomination of Pendley as BLM Director did not cure the Vacancies Act violations, because even if Pendley was qualified to serve as the Acting Director of the BLM, he was disqualified when the President formally nominated him to serve as the BLM Director because he did not serve as the "first assistant" to

26

the BLM Director in the year before the vacancy first occurred. *See id.* § 3345(b).

77.     William Pendley was never properly authorized to perform the functions and duties of the BLM Director in an acting capacity, so his appointment violated the Vacancies Act and the Appointments Clause.

78.     As an unlawfully appointed Acting Director of the BLM during the period when DNR submitted its protest of the Proposed UFO RMP, William Pendley improperly assumed the Director's responsibility for reviewing and rejecting DNR's protests.

79.     The Approved UFO RMP, which rests upon Pendley's improper resolution of DNR's protest of the Proposed UFO RMP, is void and must be set aside. *See id.* § 3348(d).

*Second Claim for Relief: Violation of the Administrative Procedure Act*

80.     DNR repeats and incorporates by reference the allegations in all paragraphs of this Complaint and Petition for Review.

*Count 1 (Pendley's Resolution of DNR Protest)*

81.    The APA forbids agency action that is "not in accordance with law." 5 U.S.C. § 706(2)(A).  It also forbids any action taken "without observance of procedure required by law," and any action that is "contrary to constitutional right, power, privilege, or immunity." *Id.* § 706(2)(B), (D).

82.    Secretary Bernhardt's appointment of William Pendley as Acting Director of the BLM, William Pendley's exercise of the authority of the BLM Director, and William Pendley's actions taken in that role violate the APA.

83.    Secretary Bernhardt's order on July 29, 2019, appointing Pendley as Acting Director of the BLM was an unlawful agency action because it violated both the Vacancies Act and the United States Constitution. The order therefore violated the APA.

84.    Secretary Bernhardt's subsequent orders reauthorizing Pendley to serve as Acting Director of the BLM, violated the APA as well.

85.    William Pendley's service as the Acting Director of the BLM, including his service after his nomination was sent to the Senate, which were based on Secretary Bernhardt's unlawful orders, also violated the APA.

86.    Accordingly, the Approved UFO RMP, which rests upon Pendley's improper resolution of DNR's protest of the Proposed UFO RMP, is unlawful and must be set aside.  *See* 5 U.S.C. § 706(2).

*Count Two (Shoemaker's Resolution of DNR Protest)*

87.    If, in the alternative, BLM's Deputy State Director for the State of Idaho June Shoemaker, in her role as Acting Assistant Director of Resources and Planning at the time, resolved DNR's protest, then the BLM's finalization of the Approved UFO RMP violated the APA.

88.    The APA forbids agency action that is "not in accordance with law." 5 U.S.C. § 706(2)(A). It also forbids any action taken "without observance of procedure required by law," and any action that is "contrary to constitutional right, power, privilege, or

immunity." *Id.* § 706(2)(B), (D).

89.     BLM's regulations stipulate that the BLM Director "shall promptly render a decision on the protest."  43 C.F.R. § 1610.5–2(a)(3).

90.     Even if the BLM Director's authority for resolving DNR's protest could have been delegated to an inferior officer, no valid delegation of that duty existed at the time DNR's protest was denied.

91.     Accordingly, if the Approved UFO RMP rested upon Acting Assistant Director Shoemaker's improper resolution of DNR's protest of the Proposed UFO RMP, it is unlawful and must be set aside.  *See* 5 U.S.C. § 706(2).

PRAYER FOR RELIEF

For these reasons, DNR respectfully request that this Court:

a.     Declare that William Pendley's appointment as Acting Director of the BLM, his exercise of the authority of the BLM Director, and his actions taken in that role, including during the pendency of his nomination to the position of BLM Director, violated the Appointments Clause of the United States Constitution, the Federal Vacancies Reform Act, and the Administrative Procedure Act;

b.     In the alternative, declare that BLM Deputy State Director for the State of Idaho June Shoemaker's  resolution of DNR's protest of the Proposed UFO RMP, in her role as Acting Assistant Director of Resources and Planning at the time, was contrary to law;

c.     Set aside the Approved Resource Management Plan for the Uncompahgre Field Office;

d.     Enter such other declaratory and/or preliminary or permanent injunctive relief as DNR may specifically request hereafter;

e.    Award   DNR   its   costs,   attorneys'   fees,   and   other

disbursements for this action;  and

f.    Grant any other relief this Court deems appropriate.

PHILIP J. WEISER
Attorney General


s/ W. Cory Haller
LISA A. REYNOLDS, 35827*
First Assistant Attorney General
Parks, Wildlife & Trust Lands Unit

W. CORY HALLER, 41356*
Assistant Attorney General
Parks, Wildlife & Trust Lands Unit

Attorneys for Plaintiff

Ralph L. Carr Colorado Judicial
  Center
1300 Broadway, 7th Floor
Denver, Colorado 80203
Telephone:  720-508-6304
E-Mail:  cory.haller@coag.gov
*Counsel of Record